# INGA L. PARSONS, ESQ.

| Admitted to MA NY WY | **Attorney at Law** | Tel: 781-581-2262 |
| Federal Court | **3 Bessom St. No. 234** | Fax: 781-842-1430 |
| U.S. Supreme Court | **Marblehead, MA  01945** | Inga@IngaParsonsLaw.com |

July 25, 2010

BY FACSIMILE: 718 613 2518 (8 pages)

Honorable David G. Trager
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

Re: *Mayer Vaknin v. United States*, 08-CV-2420; 06-CR-82

Dear Judge Trager:

I submit this letter in response to the government's submission which was filed on Friday, July 23, 2010 in response to Mr. Vaknin's request for bail that was filed by the defense on June 1, 2010; six weeks ago.  As this Court is aware, the hearing in this matter is scheduled for Wednesday, July 28, 2010 in the morning.  The defense has worked diligently in an effort to reply in advance of the hearing given the government's inexplicable delay in providing their submission so close to the hearing.

It cannot be emphasized enough that the primary thrust and theory of the government's case was count twelve, which concerned the sale of Cellular Island customer identities - and only Cellular Island customer identities - that were subsequently used to obtain T-Mobile handsets through the mail.   Well before Mr. Vaknin pled guilty to count twelve, AUSA Rabkin was in possession of exculpatory information from co-defendants Kinda George and Patrick Rodriguez and St. Rose that Mr. Vaknin had no knowledge and did not activate or sell any of the 822 cellular island customer accounts in which allegedly, 1940 handsets were fraudulently ordered.  The handset fraud was limited to the 1940 handsets--no others; that was evident from the wording in the count itself, statements made by the government at sentencing and from the letter of Nelson Boxer who was in charge of the investigation.

At the July 7, 2006 plea hearings AUSA Rabkin adopted T-Mobiles conclusions and figures and stated: those guideline figures are based on a loss estimate of approximately, 1.2 million to T-mobile. To date the government determined there were at least 1949 [sic] fraudulent handset orders on Cellular Island accounts resulting in a loss to T-Mobile of approximately $741,000.   (See, Plea Transcript of 7/7/2006 at 34)

Nelson Boxer, a former AUSA, who represented T-mobile's interests wrote the Department of Probation that:

> Based on the investigative efforts of T-Mobile and the United States
> Secret Service, it appears that the defendant's criminal conduct caused T-
> mobile to ship at least 1,940 handsets with a retail value of $741,731.64 to
> fulfill fraudulent handset orders placed on 822 separate accounts activated
> at the defendants sub-dealer locations... All 1,940 of these handsets were
> ordered on customer accounts that were activated by defendant....
> Defendants retail employees likely did not have access to the necessary
> information to make the fraudulent handset orders... As the activating
> dealer for these customers, defendant had access to all the information
> necessary to order a new handset for that existing customer.

Nelson Boxer letter 9/26/06 at 3-4.

The proffer notes of Kinda George and Patrick Rodriguez and even St. Rose were
at odds with the government's theory with its case—and continue to be at odds with the
government's response.  They were obviously exculpatory.  Such information is
favorable to the defense no matter what else may have been said or how conflated the
statements are treated by the government.  The government has never denied that it had
this information well before the guilty plea.

The government attempts to gerrymander the evidence to claim that the other
names obtained by Mr. Vaknin were used to fraudulently obtain handsets (there is no
evidence of this) and conflates two entirely separate criminal events including its
description of the St. Rose proffer in an attempt to claim it was not exculpatory.  All of
the evidence, including the timing of when this other non-Cellular Island customer
information  was obtained by Mr. Vaknin (over a year before) belie any connection to the
Rodriguez/George scheme.  The government's assertion that the sale of the other names
somehow makes Mr. Vaknin guilty of the handset fraud is self-evidently disingenuous
and contrary to the evidence and to the statements of their cooperating witnesses.
Moreover, it does not negate the fact that those statements, no matter how self-serving the
explanation of the context by the government*, were favorable to the defense.*

A brief review of the government's failure to disclose this information given their
recent submission follows and clearly shows the likely success of Mr. Vaknin's petition
and why his petition should be immediately granted, or, in the alternative, bail set:

At the outset, Mr. Michael Rosen, Mr. Vaknin's attorney, asked for relevant
exculpatory information, to which AUSA Rabkin responded in a February 28, 2006 letter
stating, "the government is unaware of any exculpatory material regarding the defendant
in this case".  Mr. Rabkin further stated, "that it was aware of and will comply with its
obligation to produce exculpatory material or information under *Brady v. Maryland*, 373
U.S. 83 (1963)."

Mr. Harold Pokel, who replaced Mr. Rosen as Mr. Vaknin's counsel, stated in his affidavit that, "Mr. Vaknin advised me that he was told by his co-defendant Patrick Rodriguez that it was Patrick and Kinda George who had done the handset fraud conspiracy... I thereafter spoke to AUSA Rabkin and advised him of this fact. Mr. Rabkin told me in substance that they knew that Mr. Vaknin was responsible for this and that Mr. Vaknin was guilty of the handset fraud period... Patrick's statement did not make any difference... If the government had disclosed to me as it was obliged to do that Rodriguez and George had, indeed, informed AUSA Rabkin and the agents that they themselves had committed the handset fraud, entirely without the knowledge of Mr. Vaknin, that would have completely changed my view of the evidence against Mr. Vaknin. Armed with those disclosures, (which the government, shockingly, never made) I would have emphatically advised Mr. Vaknin not to accept the government's plea offer."  (Pokel Aff. at ¶s 6-7)

AUSA Rabkin stated in his affidavit that "I do not recall that either Mr. Pokel or Mr. Levy raised the issue of Vaknin's employees selling customer information without his knowledge during any negotiations." Mr. Rabkin further states "at no time during these plea discussions did Mr. Pokel ask the government to provide discovery relating to Vaknin's case or dispute any of the government's allegations or prosecution theories." AUSA Rabkin's lack of recall is supplanted by Mr. Pokel's clear recollection of that conversation.  However, Mr. Pokel makes clear that "[i]n fact, I did tell that, most emphatically, to Mr. Rabkin at that time." (Pokel Aff. at ¶ 8).  Moreover, Mr. Pokel had many dealings with AUSA Rabkin and found it striking that Rabkin was "always definitive" in his position and recollections in previous situations.  *Id*. at ¶ 9.

Mr. Rabkin states in his August 28, 2009 affirmation, "Mr. Mitchell has asserted that I refused to provide him with information relating to the governments loss calculation. This is incorrect." He further states "Mr. Mitchell never informed me at any time that he believed the government had violated its Brady obligations or acted improperly in any way, or that he lacked sufficient information adequately to represent Vaknin."

However, in Mr. John Mitchell's September 6, 2006 letter to Jeffrey Rabkin (which obviously predates this litigation) he stated specifically that, "since we last spoke I have been in contact with all of Mr. Vaknin's prior attorneys in an effort to gather all information available. I have spoken with Mr. Rosen, Mr. Okeke, Mr. Pokel and Mr. Levy. Nevertheless I have not been able to acquire sufficient information to be able to discern the basis of the government's loss figures. From our prior conversations it appeared to me that the [sic] you intend to challenge any request by the defendants that he be given the necessary information and data to analyze the governments loss calculations. I believe that the way you put it was 'why would it be in the government's best interests for me to provide you with that information.'"

There is simply no denying that throughout the plea process AUSA Rabkin had information that was entirely at odds with the government's theory of its case against Mr.

Vaknin; it knew without a doubt that Kinda George was the only person with the "necessary information to make the fraudulent handset orders" and that both Mr. Rodriguez and Ms. George and St. Rose informed AUSA Rabkin that Vaknin had no knowledge that Cellular Island customer identities were being sold by them.  This information was withheld throughout the proceedings including

     a) withheld from your honor at the plea hearings;

     b) withheld from T-mobile and the Secret Service who conducted the investigation that became the government's case and concluded (erroneously in the absence of that information) that it was Mr. Vaknin that defrauded 822 cellular island customers in which allegedly 1940 handsets were fraudulently ordered; and

     c) withheld from Mr. Vaknin's attorneys, Mr. Pokel, Mr. Levy, Mr. Rosen, who requested the information to help them effectively determine whether Mr. Vaknin should take a plea.  As Mr. Pokel made crystal clear; had he had this information "(which the government, shockingly, never made), I would have emphatically advised Mr. Vaknin not to accept the governments plea offer".  This alone is enough to overturn the plea.

     The government's response in this latest volley (now infused with the unmistakable shrill vitriol of AUSA Rabkin) provides no satisfactory answer to the failure to turn this information over.  Their sole attempt is to assert that Mr. Vaknin's Brady claim has no merit because Mr. Vaknin had "access to the information" from a brief discussion Mr. Vaknin had with Mr. Rodriguez in a holding pen.

     Mr. Pokel's affidavit stated that he told Mr. Rabkin that "Mr. Vaknin advised me that he was told by his co-defendant Patrick Rodriguez that it was Patrick and Kinda George who had done the handset fraud conspiracy and they had told the government that they had done the scheme behind Mr. Vaknin's back." (*See* Pokel's Aff. at ¶ 6)   Most shockingly, when confronted with that information by Mr. Pokel, the Rabkin not only failed to disclose the statements in the government's possession but by his response disavowed the existence of the exculpatory statements which underhandedly eviscerated the exculpatory nature of the statements to the defense so that they no longer had access or would have believed that such exculpatory information existed.  In other words, to the extent the statements made in the holding pen provided Mr. Vaknin with the essential facts (which the defense disputes); those facts were taken away from Mr. Vaknin given the misleading response of AUSA Rabkin to defense counsel.

     The Supreme Court has made clear that such behavior cannot be tolerated:

          A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process. "Ordinarily, we presume that public officials have properly discharged their official duties." We have several times underscored the

> "special role played by the American prosecutor in the search for truth in
> criminal trials." Courts, litigants, and juries properly anticipate that
> "obligations [to refrain from improper methods to secure a conviction] ...
> plainly rest[ing] upon the prosecuting attorney, will be faithfully
> observed." Prosecutors' dishonest conduct or unwarranted concealment
> should attract no judicial approbation.

*Banks v. Dredtke*, 540 U.S. 668, 696 (2004) (citation omitted).  Put simply there is
no getting around the fact that the government hid this evidence from the defense and that
it was exculpatory.

In a criminal prosecution, the government is constitutionally obliged to disclose
evidence favorable to the accused when such evidence is material to guilt or punishment.
*Brady v. Maryland,* 373 U.S. 83, 87, (1963). The government's duty under *Brady* is fairly
settled:

> To the extent that [a] prosecutor knows of material evidence favorable to
> the defendant in a criminal prosecution, the government has a due process
> obligation [grounded in the 14th Amendment] to disclose that evidence to
> the defendant. Information coming within the scope of this principle ...
> includes not only evidence that is exculpatory, *i.e.,* going to the heart of
> the defendant's guilt or innocence, but also evidence that is useful for
> impeachment, *i.e.,* having the potential to alter the jury's assessment of the
> credibility of a significant prosecution witness.

*Id.* (citations omitted).

*Brady's* announcement of a constitutional duty on prosecutors to disclose
exculpatory evidence to defendants embodies more powerfully than any other
constitutional rule, the core of the prosecutors ethical duty to seek justice rather than
victory.  The message of *Brady* and its progeny is that a trial is not, in the words of
Justice Brennan, a mere "sporting event"; it is a quest for truth in which the prosecutor,
by virtue of his office, must seek truth even as he seeks victory. *See United States v.
Bagley,* 473 U.S. 667, 675, ( *Brady* rule to "ensure that a miscarriage of justice does not
occur") (cited in *Monroe v. Blackburn*,  476 U.S. 1145, 1148 (1976).

In *Brady* the Supreme Court held that "the suppression of the prosecution of
evidence favorable to an accused upon request violates due process where the evidence
material either to guilt or to punishment, irrespective of the good faith or bad faith of the
prosecution."   *Brady,* 373 U.S.at 87.

The Second Circuit has likewise held prosecutors to the highest standard.  In
*United States v. Gil*, 297 F.3d 93 (2d Cir. 2002), an internal memo that was provided
before trial, rather than, as, here, where the information was not produced until well after

Mr. Vaknin took a plea. In *Gil*, the district court denied the defendant's motion for a new trial, finding no Brady violation because the memo had been turned over before the defense prior to trial and was not "buried", was neither exculpatory or inculpatory, and would not have altered the outcome of the trial". *See id* at 98-99. The Court of Appeals vacated the judgment finding the memo to be material, exculpatory and impeaching Brady material and that "the government possessed the Bradford memo long before it was turned over to the defense. The government has not otherwise undertaken to justify its failure to find and timely deliver the Bradford memo, and there is no obvious explanation for this failure in light of the defendant's numerous requests for such documents." *Id*. at 107-08.

In Mr. Vaknin's case, the center piece and the theory of the government's case was count twelve. Mr. Vaknin repeatedly told his counsel that he did not commit the crime outlined in count twelve. Mr. Pokels affidavit confirms that although "heavily pressed to do so Mr. Vaknin did not admit to that conduct during the proffer sessions." (Pokel Aff. at ¶ 2-3). Mr. Pokel was "never advised by the government that individuals had told them that they had done the handset fraud conspiracy and that Mr. Vaknin had no knowledge of it... The government not only withheld this information from me but also from his prior attorney Mr. Rosen, because it was not in the file turned over to me." (*Id*. at ¶ 13).

In *Gil*, "the defense had a good faith belief the requested documents...exist and had not been produced," even though they "constituted exculpatory and impeachment evidence" and were essential to the defense" *Gil* 297 F.3d at. 252. "The defense warned as the trial date is rapidly approaching the defendant is suffering incurable harm and prejudice because he is unable to defend against the superseding indictment." *Id*. at 254. Likewise, in Mr. Vaknin's case, he (as well as Mr. Pokel) had a good faith belief that the information received from Mr. Rodriguez would result in the government's possessing at least some material and/or exculpatory evidence. Instead, the government dispelled the existence of the exculpatory evidence, and, contrary to that evidence, represented through misrepresentation that there was no such evidence and that Mr. Vaknin was guilty of the crime. The government's attempt to extricate itself from a "Brady" violation by claiming access to information is disingenuous at best.

The government's assertion that this information is not "Brady" material is bone chilling. If statements of a co-conspirator stating that a defendant was unaware of criminal activity is not exculpatory then what is? Instead the government desperately tries to conflate two separate identity theft issues including those in Ms. St. Rose's statements and in the case in general in an effort to sanitize this despicable concealment. That "small portion" of St. Rose's proffer is exculpatory to the handset fraud; the remainder relates to an *entirely separate scheme* involving only Mr. Vaknin in the purchase of identities that were not Cellular Island customers and were purchased more than a year before and were not used in the hand set fraud.

Hon. David G. Trager                                                                July 25, 2010
*Vaknin v. United States*, 08-CV-2420; 06-CR-82                                      Page 7 of 8

Indeed, there is absolutely no proof that the other names were used to fraudulently obtain any hand sets and the government provides none or any nexus between the two schemes, particularly given the fact that Mr. Vaknin was entirely unaware of the handset fraud scheme as was known and admitted to by the government and the handset fraud is only described as the fraud involving Patrick Rodriguez's 1940 handsets—no others. (Mr. Vaknin is in the process of setting forth a responding declaration to further rebut the government's misuse of the St. Rose proffer which we will submit upon his completion which is obviously delayed due to his incarceration and the late response by the government).

In addition, the government provides no satisfactory explanation for the fact that the guideline range that was used in the co-defendant's Patrick Rodriguez' case was 21-27 months other than that was indeed the true guideline range.  The Court should understand that it was AUSA Rabkin who conceded that 21-27 months was the guidelines in Rodriguez' case.  *See* Sentencing Transcript attached hereto as Exhibit A.

Despite two previous affidavits from AUSA Rabkin, there is no affidavit from him on the 21-27 months enlightening Ms. Nash's lack of knowledge or the "mystery" of this low range.  Indeed, there is no mystery, as it mirrors the guideline range John Mitchell calculated in his objections to the PSR for Mr. Vaknin.   Ms. Nash merely shrugs off the issue by stating it was a cooperation situation and Vaknin had other points. The fact of the matter is that the bulk of Mr. Vaknin's increased guideline range came from the monies involved in the handset fraud scheme which should not have been credited to him.  Indeed, the minutes make clear that the reductions were the result of a recalculation of the amount of loss and a reduction for a reduced role.  The amount of loss would equally apply to Mr. Vaknin and as he had no role in the handset fraud this would obviously affect his guideline range.  Moreover, we fully dispute the obstruction of justice enhancement which has been set forth in detail in previous submissions.

Furthermore, to say that the 21-27 months was not the true guidelines belie the guideline practice and the integrity of the sentencing process.  As a federal public defender for five years and a federal criminal practitioner for over 20 years in the Eastern and Southern Districts of New York, representing countless cooperators, there was never a time when the guidelines were manipulated for cooperation purposes.  Rather, the true guidelines were calculated and it was from that guideline range that the cooperation was taken into account.  Indeed, the more common practice was to ensure that the cooperator received the brunt of *all of the conduct* before any cooperation was applied to add credibility to the cooperator during testimony.  Ms. Nash's implication that the 21-27 was somehow contrived is unconvincing.

The fact is, that after the figures were actually investigated and it became clear that they had been inflated and exaggerated by T-Mobile and when connected to the true facts (which, incidentally came about because John Mitchell obtained the records and reviewed them) the actual guideline range was indeed 21-27 months as conceded by none

other than AUSA Rabkin.  Mr. Rodriguez may have had lower points, but he also had a
higher criminal history category.  Mr. Vaknin was a first offender.  Mr. Rodriguez had a
higher criminal history category.  Without the handset fraud, Mr. Vaknin's guideline
range tumbles not increases.

Not only is the ordinarily highly vocal AUSA Rabkin silent as to the basis for the
21-27 months, but there is no responding affidavit with respect to the declaration of Mr.
Pokel (filed back in March 2010) as to what was said with respect to conversations that
AUSA Rabkin uncharacteristically could not recall.  The absence of any such affidavit is
enormously telling.

The government threatens that Mr. Vaknin would have to go to trial and that his
guideline could be the same as he has now.   Bring it on if that is what it takes to get
justice.  There are clearly exceptional circumstances—Mr. Vaknin is already serving
more than 21-27 months assigned to Rodriguez for the handset fraud *which is the bulk of
Mr. Vaknin's previous guidelines* and in fact has served nearly one year more than the
high end of the guideline range.  The government utterly fails to provide a convincing
difference.  That alone is exceptional circumstances which cannot be overcome by
merely disagreeing with the guideline calculations particularly when those *very same*
guidelines were conceded in the co-defendant's sentencing.  Moreover, the government is
not prejudiced, because if the bail is granted and should it turn out that more time is
required, Mr. Vaknin can self surrender as he has done in the past.

In sum, Mr. Vaknin should have his plea vacated.  If that decision is still to be
under advisement, Mr. Vaknin should be released on bail immediately.

Sincerely,

/s/

Inga L. Parsons

Cc:     Nash, R. (ECF/email)
        Vaknin, M. (by email)