UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

MAYER VAKNIN,

        Petitioner,              <u>MEMORANDUM AND ORDER</u>

  -against-                Civil Action No.
                               08-CV-02420 (DGT)

UNITED STATES,

        Respondent.

-------------------------------X

Trager, J:

    After pleading guilty pursuant to a plea agreement and
later entering into an 84-month sentencing stipulation,
defendant Mayer Vaknin ("Vaknin") filed the instant motion under
28 U.S.C. § 2255 seeking to vacate his sentence and conviction.
Vaknin raises <u>Brady</u> and ineffective assistance of counsel
claims.  For the reasons explained below, his motion is denied.


**Background**

    Defendant Mayer Vaknin operated fourteen cell phones stores
in downtown Brooklyn under the names "Cellular Island" and
"Cellular Tropics."  Aff. of Mayer Vaknin in Supp. Motion to
Vacate Sentence and Resentence Def. ("First Vaknin Aff.") ¶ 14;
Supp. Decl. Mayer Vaknin in Supp. Habeas Corpus Pet. ("Supp.
Vaknin Decl.") ¶¶ 4-5.  Although Vaknin's stores represented
different wireless carriers, most of the stores' revenue was

generated with T-Mobile USA, Inc. ("T-Mobile").  Supp. Vaknin
Decl. ¶ 4.  Cellular Island was authorized to:  (1) enter into
new customer service agreements on behalf of T-Mobile; (2) renew
existing T-Mobile customer service agreements; and (3) modify
existing T-Mobile customer service agreements by adding
additional lines of service.  Presentence Investigation Report
("PSR") ¶ 9.  This enabled Cellular Island to earn commissions
and other incentive payments from T-Mobile.  Sept. 26, 2006
Letter from T-Mobile to Probation Department ("T-Mobile Letter")
at 2.  Cellular Island, which maintained its own inventory of
T-Mobile phones, would also generate profits selling phones.
Id.  Vaknin dealt with T-Mobile through a "Master Dealer,"
American Telecommunications, Inc. ("Ameritel"), which was owned
by Nathan Yonovitch.  Supp. Vaknin Decl. ¶ 4.

### (1)

### Indictments

On February 9, 2006, Vaknin and Cellular Island employees
Patrick Rodriguez and Kinda George (collectively "defendants")
were indicted.  Vaknin and George were charged with conspiracy
to commit wire fraud (Count 1), wire fraud (Counts 2-11) and
aggravated identify theft (Counts 13-22) in connection with a
scheme to obtain commissions from T-Mobile by fraudulently
renewing contracts of T-Mobile customers.  In addition, Vaknin

and Rodriguez were charged with conspiracy to commit mail fraud
(Count 12), aggravated identify theft (Count 23) and access
device fraud (Count 24) in connection with a scheme to sell
customers' names and social security numbers to other
conspirators who then used the information to fraudulently order
and receive mobile telephone handsets through the mail.  The
indictment also included two criminal forfeiture counts that
sought the proceeds of the schemes.

On May 9, 2006, a superseding indictment was issued, which
explained the alleged schemes in greater depth and added an
obstruction of justice charge against Vaknin (Count 25).
According to the superseding indictment, Vaknin engaged in three
different schemes.  In the first two schemes alleged (charged,
collectively, in Counts 1-11 and 13-22), Vaknin obtained the
names and social security numbers of T-Mobile customers from
customer service agreements and credit reports as well as from
an electronically stored list of T-Mobile customers that was
purchased from another T-Mobile sub-dealer.  Vaknin and George
would then, without the customers' knowledge, use that
information to record new service agreements, renew existing
service agreements and add additional lines of service to
existing customers' agreements.  These actions were undertaken
so that Cellular Island could receive from T-Mobile both Special
Incentive Funds ("SPIF") payments ("the SPIF Fraud scheme") and

additional commissions for contract renewals ("the Commission Payment Fraud scheme").

In the third scheme set forth in the superseding indictment ("the Fraudulent Handset scheme"), Vaknin, Rodriguez, George and others allegedly defrauded T-Mobile and its customers by fraudulently obtaining cellular telephone handsets (Counts 12, 23 and 24, collectively "the Fraudulent Handset scheme counts"). Specifically, the defendants and others provided and sold the names and social security numbers of "T-Mobile customers to [unindicted co-conspirators] for the purpose of enabling those co-conspirators fraudulently to place orders with T-Mobile for cellular telephone handsets." Superseding Indictment ¶ 18. Using that information, the unindicted co-conspirators would order phones from T-Mobile without the knowledge and consent of the customers. After the unindicted co-conspirators received delivery of the fraudulently obtained phones, they sold the phones to defendants and others, who resold some of the phones at Vaknin's stores.

## Factual Background of Criminal Activities

**a. The SPIF Fraud and Commission Payment Fraud Schemes**

Vaknin concedes that he is guilty of conspiring to commit the SPIF Fraud and Commission Payment Fraud schemes charged in Count 1.  In these two schemes, Vaknin used the names and Social Security numbers of T-Mobile customers, without their knowledge, to renew the customers' service agreements and to add additional lines of service to the customers' accounts so that he would qualify for various incentive payments and commissions from T-Mobile.  PSR ¶ 11.  Although Vaknin concedes that the loss amount for those two schemes is $101,968, Mem. in Supp. 2255 Pet., Post Hearing Submission, at 32, the government maintains that much higher loss amounts are attributable to those schemes.

**b. The Fraudulent Handset Scheme**

**i.   Overview**

Although Vaknin disputes certain facts concerning the Fraudulent Handset scheme, many of the facts surrounding this scheme and Vaknin's role in it are undisputed.[1]  T-Mobile

---

[1]  As explained _infra_, Vaknin participated in a number of proffer sessions with the government, but, ultimately, was not given a cooperation agreement by the government.  He eventually pled guilty to Count 1 (related to the SPIF Fraud and Commission Payment Fraud schemes) and Counts 12 and 23 (related to the Fraudulent Handset scheme) pursuant to a plea agreement.  The

customers can receive new handsets when they add additional
lines of services to an existing account or when they choose to
upgrade the handset that is being used for their existing line
of service.  T-Mobile Letter at 2.  When a customer orders a new
handset, the handset is shipped directly to the customer's
billing address and the cost of the handset is added to the
customer's monthly bill.  Id.

In conducting the Fraudulent Handset scheme, a group of
street dealers referred to as the "hushos" (or "hushers") would
obtain T-Mobile customer information from various sources.[2]  The
hushos would then contact T-Mobile and order phones, which would
be charged to the accounts of the unsuspecting customers.  The
phones would be shipped by overnight delivery companies to
addresses where the hushos, who were working in concert with

---

facts set out in this section concerning the Fraudulent Handset
scheme come primarily from:  (1) the proffer notes of Vaknin's
employees who cooperated with the government (namely, Kinda
George, Patrick Rodriguez, Ralph Colon, Jason Pimentel, John
Hampton, Janelle St. Rose and Dellaverne James); (2) the various
affidavits and declarations submitted by Vaknin in the instant
proceeding; (3) the notes from Vaknin's own proffers sessions
with the government; (4) Rabkin's affidavit, which recounts
Vaknin's admissions during his proffer sessions; and (5) the
PSR.

[2]  As explained infra, the hushos would obtain T-Mobile customer
information from George, Rodriguez, Vaknin and other sources.
It must be stressed that, unless otherwise specified, the term
"T-Mobile customer information" refers to T-Mobile customer
information generally and is not limited to T-Mobile information
that was obtained from any particular source.

shipping company employees, would intercept the phones.  The
hushos would then sell the phones.

In 2004, Vaknin and his employees began dealing with the
"hushos," who came to Vaknin's stores to sell phones.  Notes
from proffer of Pimentel dated Mar. 2, 2006 ("Mar. 2 Pimentel
notes").[3]  Although there were a number of different hushos,
these individuals were "all together," with one individual
appearing to act as leader of the group.  Notes from proffer of
Rodriguez dated May 24, 2006 ("May 24 Rodriguez notes"); 3500-
PR-4.

Although Vaknin has admitted selling T-Mobile customer
information to the hushos and purchasing phones from the hushos,
Vaknin claims that he was not aware that the hushos were using
the Fraudulent Handset scheme described above to fraudulently
obtain those phones from T-Mobile using customer information.

**ii.  Sale of Information to the Hushos**

**A.  Sale by Vaknin**

At some point, most likely in 2004, Vaknin purchased one or
more CDs "containing T-Mobile customer information from [another
T-Mobile sub-dealer that] had gone out of business."  Mayer
Vaknin Suppl. Decl. Filed Oct. 9, 2009 ("Vaknin. 2009 Supp.

---

[3]  Many, but not all, of the proffer notes provided by the
government have exhibit stamps.  Where notes do not have exhibit
stamps, they are identified by witness and date of proffer
session.

Decl.") ¶ 13(a).  As the CD came from another sub-dealer, it did not contain the identity information of any Cellular Island customers.  Supp. Vaknin Decl. ¶ 48.  Vaknin used some of the information on the CD, along with information from other sources, to conduct the SPIF Fraud and Commission Payment Fraud schemes.  PSR ¶ 11.  In addition, Vaknin and various employees acting at his direction (including Colon and Hampton) were involved in selling some of the customer information on the CD to the hushos.  See 3500-DJ-9 (stating that Colon was involved in selling information to hushos); 3500-RC-5 (admission by Colon that he would print out information for Hampton and Vaknin); Rabkin Aff. ¶ 17 (stating that Vaknin admitted that he directed his employees to sell information to the street dealers).[4] According to Vaknin, when he sold customer information from the CD to the hushos, he received only cash as compensation.  Vaknin 2009 Supp. Decl. ¶¶ 5-6, 8.  These sales appear to have occurred sometime between the summer of 2004 and spring of 2005.[5]

---

[4]  Neither Rodriguez nor George played any role in Vaknin's sale of customer information from the CD to the hushos.  Vaknin 2009 Supp. Decl. ¶ 8.  However, as explained infra, Rodriguez did purchase phones from the hushos at Vaknin's direction.

[5]  It is unclear exactly when Vaknin purchased the CD and when he sold information to the hushos.  In one declaration, Vaknin claims that he sold information to the hushos "during about one week" in the summer of 2004.  Vaknin 2009 Supp. Decl. ¶¶ 9, 13(a), 13(g); see also 3500-JH-7 ("Mike Bought Disc w/ client info summer 2004").  But Vaknin's proffer notes indicate these sales occurred sometime between late 2004 and early 2005.  3500-

Vaknin admitted selling information from the CD to a husho named "Shah" and to a number of other hushos. 3500-MC-9; 3500-MC-12; 3500-MC-14; see also 3500-JH-5 (identifying certain individuals that Vaknin sold information to as hushos); 3500-PR-4 (same); Mar. 2 Pimentel notes (same). Shah approached Vaknin and repeatedly asked Vaknin to sell him customer information until Vaknin complied. 3500-MC-9; Notes from proffer of Vaknin dated Apr. 25, 2006 ("Apr. 25 Vaknin notes").

Vaknin has made conflicting statements regarding the number of customer identities that he sold to the hushos. In one declaration submitted in the instant proceeding, Vaknin stated that "on twenty occasions or so" he sold customer information. Supp. Vaknin Decl. ¶ 48 (emphasis added). That declaration appears to be consistent with the proffer notes indicating that Vaknin admitted that he sold customer information to the hushos "about 20-30 times." 3500-MC-12; see also 3500-MC-11 (handwritten proffer notes stating "sell info on street 20-30"). Although neither the declaration nor the proffer notes explicitly address how many customer identities Vaknin sold, it can be assumed that he sold multiple identities on each "occasion." In other declarations from the instant proceeding,

MC-14. The PSR, which conflicts with both Vaknin's declarations and the proffer notes, states that Vaknin purchased the CD "in the summer of 2005." PSR ¶ 11.

Vaknin asserts that "during about one week," he sold, in total, less than 20 customer identities.  Vaknin Oct. 2009 Supp. Decl. ¶ 5 ("(20 or less) customer ids"); First Vaknin Aff. ¶ 98 ("five to ten items"); Vaknin Post-Hearing Decl. ¶¶ 9-11 ("5-10 sales of information"); ¶ 15 ("5-10 non-Cellular Island information"). It should be noted that, at the plea hearing, Vaknin admitted selling a "minimal amount" of social security numbers, but did not specify the amount.  Plea Hr'g Tr. at 39.

After Vaknin sold information to the hushos, some hushos came to the office and complained to Colon that the information they had gotten was no good.  3500-DJ-9; 3500-DJ-10.  Colon then contacted Vaknin and gave new customer information to the hushos as directed by Vaknin.  3500-DJ-9; 3500-DJ-10; 3500-RC-5.

## B.  Information Sold by George and Rodriguez

In 2005, George, who had access to Cellular Island's computer system, sold the identity information of Cellular Island customers to Rodriguez, Yousef Mourden and, to a lesser extent, an individual referred to as "Simon."  3500-KG-5; 3500-KG-6; PSR ¶ 43.  Rodriguez and Mourden, who could not access the computer system on their own, "would then take the customer information and sell it to the 'hushers' who would then proceed with the handset scheme."  Notes from proffer of St. Rose dated Dec. 21, 2005 ("Dec. 21 St. Rose notes").  As explained below,

all of these sales were presumably made without Vaknin's
knowledge.

George appears to have sold at least 822 Cellular Island
customer identities to Rodriguez and Mourden.  PSR ¶ 16;
T-Mobile Letter at 3.  T-Mobile was able to determine that
information from those 822 Cellular Island accounts were used to
fraudulently order 1,940 phones ("George & Rodriguez Phones").
Id.

Vaknin insists that he was completely unaware of the sale
of Cellular Island customer information by George, Rodriguez and
Mourden.  Supp. Vaknin Decl. ¶ 44; Vaknin 2009 Supp. Decl.
¶ 13(c).  The PSR corroborates Vaknin's claim, stating that
"George sold [this] information . . . independently of Mayer
Vaknin, as he was unaware of this conduct by George." PSR ¶ 43.
The PSR appears to have been relying on St. Rose's proffer
statement that "unknown to [Vaknin]," Rodriguez and Mourden were
"paying Kinda George . . . to access the I-Cam system and get
customer information."[6]  Dec. 21 St. Rose notes.

---

[6]  Although statements by T-Mobile to the Probation Department
indicated that T-Mobile believed that Vaknin was directly
involved in selling Cellular Island customer information,
T-Mobile Letter at 3-4, the PSR did not adopt T-Mobile's
position on this issue.

### C. Other Sources of T-Mobile Information

In addition to obtaining information from Vaknin, Rodriguez and Mourden, the hushos apparently also received T-Mobile customer information from other sources.  See May 24 Rodriguez notes (indicating that one husho stated that he would also obtain information from other stores, including from his "girl," who worked in a T-Mobile store).

### iii. Purchase of Stolen Phones from the Hushos

In his proffer sessions, Vaknin admitted that he "was involved in buying and selling stolen T-Mobile phones to and from street dealers."[7]  Rabkin Aff. ¶ 17.  Vaknin repeatedly instructed employees, including Rodriguez, to purchase stolen phones from the hushos.  3500-DJ-9; 3500-DJ-10; May 24 Rodriguez notes; Mar. 2. Pimentel notes; 3500-RC-5; 3500-MC-9.

The proffer notes show that Vaknin and his employees would purchase large quantities of stolen phones from the hushos.  See

---

[7]  The PSR and the government appear to sometimes use the terms "fraudulently obtained" and "stolen" interchangeably.  The proffer notes of various cooperating witnesses, however, often refer to phones as "stolen."  Compare 3500-RC-5 (indicating that Vaknin and Pimentel instructed Colon to track incoming "stolen" phones) with PSR ¶ 17 ("inventory control system . . . was used to track the fraudulently obtained [phones]").  The difference between a phone that was "fraudulently obtained" through the Fraudulent Handset scheme and a phone that was simply "stolen" could potentially be relevant.  The term "stolen," while broad enough in layman's terms to include phones that were "fraudulently obtained" through the Fraudulent Handset scheme or otherwise, could also refer to phones that were simply stolen without any underlying fraud, such as phones that were stolen directly from warehouses or stores.

3500-RC-5 (indicating that, in 2005, Colon witnessed Vaknin purchase approximately 200-300 phones and Pimentel purchase stolen phones "20 times"); Notes from Feb. 2, 2006 proffer session of Pimentel ("Feb. 2 Pimentel notes") (indicating Pimentel saw Vaknin buy 200 stolen phones and Rodriguez buy 50 phones); Mar. 2 Pimentel notes; see also 3500-PR-4 (indicating that the "main husho" would come with 50-60 phones at a time). Hampton witnessed stolen phones being purchased over a hundred times. 3500-JH-6. Similarly, according to Pimentel, Vaknin would buy phones two or three times a week from the hushos. Mar. 2 Pimentel notes. Moreover, Vaknin himself admitted that he would send hushos to one particular store once or twice a month and would direct an employee there to purchase phones from them. 3500-MC-9. It should be noted that neither Vaknin nor the cooperating employees specified what percentage of these "stolen" phones were T-Mobile phones.[8]

Of the 1,940 George & Rodriguez Phones, 127 were activated at one of Vaknin's Cellular Island stores and, thus, presumably were sold to individual customers. PSR ¶ 16; T-Mobile Letter at 4. The fact that Vaknin consistently directed employees to purchase phones from the hushos is circumstantial evidence that

_____

[8]  As explained infra, in addition to selling T-Mobile phones acquired through the Fraudulent Handset scheme, the hushos also appear to have sold stolen phones from other carriers. 3500-MC-14; 3500-JH-3; Mar. 2. Pimentel notes.

13

these 127 phones were purchased either by Vaknin personally or at his direction.  Moreover, Vaknin almost certainly purchased more than 127 of the George & Rodriguez Phones, as evidenced by the fact that Vaknin would sell phones purchased from the hushos to both individual customers and to other stores, 3500-JSR-3; 3500-DJ-9; 3500-MC-12; 3500-DJ-3; 3500-PR-4, and the 127 phone total does not include any George & Rodriguez phones that Vaknin purchased and then sold to other stores.

Although T-Mobile's evidence linked specific Cellular Island customer accounts to specific fraudulently ordered phones, T-Mobile did not provide evidence showing that any specific phones were fraudulently ordered with the T-Mobile information that Vaknin sold from the CD.[9]  Nonetheless, there is other evidence indicating that:  (1) the hushos used the information sold by Vaknin to obtain phones through the Fraudulent Handset scheme; and (2) Vaknin purchased at least some of the phones obtained with that information.

As St. Rose explained,

> [Vaknin] would sell "Hushers" or street guys
> customer information for approximately $50
> per, so they could use that information to
> call T-Mobile and change billing address.
> After changing billing address, "Hushers"
> would order handsets to the new address.
> They would intercept these handsets and sell
> them back to [Vaknin].  [Vaknin] would

---

[9]  Vaknin's mother apparently destroyed the CD from which Vaknin sold information, Rabkin Aff. ¶ 11; Plea Hearing at 3.

either sell them in his Cellular Island
                    store or 'wholesale' them to other stores.

3500-JSR-3; see also 3500-RC-5 (indicating that Colon saw Vaknin

sell info to the hushos and that the hushos would then bring

back phones). Moreover, Vaknin has never disputed that he was

buying stolen phones from the hushos at the same time that he

was selling information to them.

      Further evidence of Vaknin's stolen phone purchases comes

from an inventory control system that Vaknin's stores used to

track stolen phones. See 3500-RC-5 (indicating that Vaknin and

Pimentel instructed Colon to track incoming "stolen" phones);

PSR ¶ 17 ("system . . . was used to track the fraudulently

obtained [phones]"); 3500-JH-3 (stating that system indicated

which phones were "stole[n]"); 3500-JH-5 (discussing inventory

of "stolen" phones). The inventory system indicated how much

money was spent to purchase the stolen phones and how much money

was earned after they were re-sold. PSR ¶¶ 17, 34. Based on

information from the inventory control system, the PSR

determined that Cellular Island sold $658,192 worth of

"fraudulently obtained" T-Mobile phones and equipment.[10]  PSR

_____

[10]  Because Vaknin obtained some T-Mobile phones from sources
other than the hushos, it appears that not all the T-Mobile
equipment referenced in the inventory control system was
obtained through the Fraudulent Handset scheme. However, there
is circumstantial evidence that the Fraudulent Handset scheme
was the source of much of this equipment. Vaknin purchased
large quantities of phones from the hushos, many of which were

                              15

¶ 17.  The inventory control system also indicated that Vaknin's stores sold $418,268 worth of "fraudulently obtained" phones and equipment for wireless providers other than T-Mobile.[11]  PSR ¶ 17.  Vaknin's repeated instructions to employees to purchase stolen phones are circumstantial evidence that this equipment was all purchased at Vaknin's direction.

Finally, it should be noted that, after purchasing stolen phones, Cellular Island employees took steps to prevent service providers, including T-Mobile, from being able to track the phones.  Rabkin Aff. ¶ 17; 3500-MC-8; 3500-MC-12; 3500-MC-14; 3500-JH-5; 3500-JH-9; 3500-RC-5; 3500-JSR-3.

---

likely T-Mobile phones that had been obtained with T-Mobile customer information sold by Rodriguez, Mourden, Vaknin and other sources.  Although Cellular Island did obtain stolen T-Mobile phones through other illegal means, there is no evidence that such phones were purchased in large quantities. See PSR ¶¶ 18-22 (discussing small purchases of phones from confidential informant); cf. Notes from proffer session of Mayer Vaknin dated May 1 ("May 1 Vaknin notes") (discussing purchases of phones from UPS drivers, but not specifying the amount of phones or the specific carrier for the phones); 3500-MC-10 (same).

[11]  The hushos appear to have sold Vaknin both stolen T-Mobile phones and stolen phones of other wireless providers.  3500-MC-14; 3500-JH-3; see also 3500-DJ-8 (indicating that Vaknin was fined by Nextel for selling stolen phones); Mar. 2. Pimentel notes.  For example, Vaknin and his employees purchased Nextel and Cingular phones from the hushos and possibly other street dealers.  Id.  In addition, as noted supra, Vaknin also purchased phones from UPS drivers.  May 1 Vaknin notes; 3500-MC-10.

### iv. **Vaknin's Knowledge of the Fraudulent Handset Scheme**

Although Vaknin denies knowing about the sale of Cellular Island information by his employees and, more broadly, that the Fraudulent Handset scheme was used to obtain the phones he purchased from the hushos, there is overwhelming evidence that Vaknin knew that those phones were, at the very least, stolen. The proffer notes clearly indicate that, at multiple proffer sessions, Vaknin admitted buying and reselling stolen phones. 3500-MC-11 ("buying and selling stolen phones"); 3500-MC-12 ("bought and sold stolen phones"); 3500-MC-14 (indicating that Vaknin admitted having meeting regarding pricing of "stolen phones."); see also 3500-JH-3 (indicating that "[t]hey know that the phones are stolen"). Even at his initial proffer session, where Vaknin claimed that he did not know where street "vendors" got their phones from, he still admitted that he thought the phones may have been stolen. 3500-MC-8. Moreover, Vaknin has never squarely denied, in any of his declarations, Rabkin's assertion that Vaknin admitted that he "was involved in buying and selling stolen T-Mobile phones to and from street dealers."[12] Rabkin Aff. ¶ 17.

---

[12] In one declaration, Vaknin states that he never knowingly purchased or directed his employees to purchase a phone that "had been fraudulently obtained from T-Mobile." Vaknin 2009 Supp. Decl. 13(f). However, when this statement is read in context it becomes clear that Vaknin is simply denying that he

Rabkin, however, asserts that, during Vaknin's proffer

sessions, Vaknin admitted, not simply that he knew the phones

were stolen, but that he was aware that the street dealers, from

whom he and his employees were purchasing phones, were using

T-Mobile customer information to obtain those phones.[13]  Rabkin

knew that he was purchasing phones that had been fraudulently
obtained with T-Mobile customer information.  <u>See</u> <u>infra</u>.

      Moreover, Vaknin has not offered any evidence to support
his counsel's broad assertions, at oral argument, that Vaknin
did not know the phones he purchased were "stolen."  Apr. 6,
2009 Tr. at 8-9, 31.  Similarly, there is no evidence to support
Vaknin's argument that he did not know that the small amount of
phones he purchased from a confidential informant were stolen.
In objecting to the PSR, Vaknin contended that in a "videotaped
conversation [between Vaknin and the informant, Vaknin] asks the
informant on several occasions (in words or substance) whether
the phones are stolen and the informant consistently insisted
that these products were legitimate."  Def.'s PSR Objections
Reply Mem. at 5; <u>see</u> <u>also</u> Def.'s Objections to PSR at 5; Apr. 6,
2009 Tr. at 8-9, 31.  However, neither the videotape nor a
transcript of its contents are part of the record.  Furthermore,
despite submitting numerous declarations on other issues, Vaknin
has never even submitted a declaration on this point (or on the
broader issue of whether he knew that he had been purchasing
"stolen" phones).  In any event, even if Vaknin's version of
this specific transaction were true, that would not undermine
the admissions of Vaknin and statements of others that show that
he knowingly purchased stolen phones.

[13]  Rabkin's affidavit explicitly states that Vaknin admitted
knowing that the hushos were obtaining phones using the
information that Vaknin and his employees sold from the CD.
Rabkin Aff. ¶ 17, 23.  It is unclear from Rabkin's affidavit
whether Vaknin also admitted to knowing that the hushos had
obtained phones using T-Mobile customer information from other
sources.  At one point, Rabkin asserts "that Vaknin admitted
that he was aware that the street dealers from whom he and his
employees purchased T-Mobile handsets had obtained those
handsets through the illegal use of T-Mobile customer
information."  Id. ¶ 22.  Although the term "T-Mobile customer

Aff. ¶¶ 17, 22, 23.  Vaknin denies making the specific admissions alleged by Rabkin.

In his declarations, Vaknin consistently denies knowing that anyone was selling <u>Cellular Island</u> customer information to the hushos or that any phones he purchased were fraudulently obtained using Cellular Island customer information.  Vaknin 2009 Supp. Decl. ¶¶ 13(d), 13(f); Supp. Vaknin Decl. ¶ 55.  Of course, if Vaknin were not aware of the sale of Cellular Island customer information by George, Rodriguez and Mourden, it would make sense that Vaknin would not know, specifically, that Cellular Island customer information was used to obtain the phones he was purchasing.

More importantly, addressing the customer information he sold from the CD, Vaknin claims that he had did know what the hushos did with the information after he sold it for cash and that he had no involvement with "whatever transpire[d]" after his sales.  Vaknin 2009 Supp. Decl. ¶¶ 10-11.  Relatedly, Vaknin also appears to deny that he ever purchased (either directly or through his employees) phones knowing that they had been fraudulently obtained using any T-Mobile customer information, <u>irrespective of the source of that information</u>.  <u>Id.</u> ¶¶ 12, 13(f).  Vaknin asserts that he was not aware that "<u>T-Mobile</u>

_____

information" could include information that came from sources
other than the CD, it could also be limited to T-Mobile customer
information from the CD.

information" was the "'source'" of the phones that he purchased.
Id. ¶ 12 (emphasis added).  Vaknin also maintains that he was
not aware of the "elaborate conspiracy" where "street hustlers
[were] somehow . . . able to divert the delivery of T-Mobile
handsets from customers to themselves."  Id. ¶ 13(f).

However, in addition to Rabkin's affidavit, there is a
plethora of other evidence indicating that Vaknin was aware of
the Fraudulent Handset scheme.  Although none of the proffer
notes explicitly state that Vaknin knew about the Fraudulent
Handset scheme, some of the notes, particularly St. Rose's
notes, supra, strongly imply that Vaknin was aware of the
Fraudulent Handset scheme.  See also 3500-RC-5 (indicating that
Colon saw Vaknin sell info to hushos and that the hushos would
then bring back phones); 3500-RC-6 (same); 3500-JH-5 (noting, in
discussion of "stolen" phones, "extra lines scheme discussed w/
[Vaknin]").  Also, there is circumstantial evidence that Vaknin
knew about the Fraudulent Handset scheme.

Many Cellular Island employees were aware that the hushos
would use T-Mobile customer information to fraudulently obtain
phones from T-Mobile.  St. Rose, Hampton and Rodriguez all
indicated that they knew that the hushos would fraudulently
obtain phones by ordering phones on customer accounts and
sending the phones to addresses where they would be intercepted.
3500-JSR-3; 3500-JH-5; Notes from proffer of Rodriguez dated

Jan. 14, 2006 ("Jan. 14 Rodriguez notes"); 3500-PR-4; May 24
Rodriguez notes; see also 3500-RC-5. St. Rose and Rodriguez
explicitly stated that they knew that the hushos would use
T-Mobile customer information to order the phones. 3500-JSR-3;
3500-PR-4; May 24 Rodriguez notes. In addition, Rodriguez also
knew that the hushos used DHL, Fed Ex and UPS in the scheme,
with DHL being the primary method of delivery.[14] May 24
Rodriguez notes; Jan. 14 Rodriguez notes; 3500-PR-4; see also
3500-JH-5 (indicating that Hampton knew that the hushos had a
"DHL connection"). St. Rose also indicated that Hampton and
Pimentel,[15] who helped Vaknin manage his various criminal
activities, PSR ¶ 41, "know everything that goes on with the
schemes," Dec. 21. St. Rose notes. All of this evidence would
be admissible to show Vaknin's knowledge of the Fraudulent
Handset scheme.[16]

---

[14]  Vaknin admitted that, in addition to purchasing phones from
the hushos, UPS drivers would also initiate contact and sell him
stolen phones directly.  May 1 Vaknin notes; 3500-MC-10.

[15]  Although St. Rose's proffer notes state "Jason Perez," not
"Jason Pimentel," St. Rose appears to be referring to Jason
Pimentel.

[16]  "[E]vidence regarding the knowledge of individuals other than
the defendant should be admitted only if there is some other
evidence in the record – concerning, for example, the nature of
the fraud or the relationship of the parties – from which to
conclude that the defendant would have the same knowledge."
United States v. Kaplan, 490 F.3d 110, 120 (2d Cir. 2007).  The
totality of the circumstances must indicate that the defendant
"was likely to have the same knowledge."  Id.  This can be shown

In addition, although Vaknin claims to have been unaware of
the Fraudulent Handset scheme, Vaknin admitted knowing that
Cingular merchandise he purchased from one husho had been stolen
from a Cingular store.  3500-MC-14.  This further indicates that
the hushos were not secretive about the sources of the phones

---

where there is evidence that the defendant "had been exposed to
the same sources from which [the] others derived their knowledge
of the fraud." Id. at 121 (reversing district court's admission
of evidence regarding knowledge of other individuals because,
inter alia, defendant "spent very little time" at the law office
where insurance scheme was conducted and this was not the type
of office where the "illegal nature of the business was
necessarily visible and audible to everyone who worked there.").
Vaknin, who played an active role in the various criminal
schemes at his stores, was clearly exposed to the same sources
as Rodriguez, Hampton, Pimentel, Colon and St. Rose, who all, it
can easily be assumed, derived their knowledge from either the
hushos or fellow Cellular Island employees.  It should be noted
that the fact that almost all of those employees were also aware
of the sale of Cellular Island information does not affect the
admissibility of the evidence above or show that Vaknin was not
aware of the Fraudulent Handset scheme.  There is no evidence
that their knowledge of the Fraudulent Handset scheme came only
from the sources from which they had learned about the sale of
Cellular Island information.  See Feb. 2 Pimentel notes ("Josef
told [Pimentel] that [Rodriguez] was selling customer info from
[Cellular Island] to street guys"); 3500-RC-5 ("heard
[Rodriguez] was selling customer info . . . .").  More
importantly, because Vaknin was the owner of Cellular Island,
his employees and the hushos may have had numerous reasons not
to tell him about Rodriguez's theft and sale of Cellular Island
information, including the fact that some of the employees were
themselves stealing from Vaknin's stores.  See 3500-JH-7
(stating that Hampton stole cash, gift certificates and
equipment from Cellular Island).  In contrast, neither the
employees nor the hushos had any reason to conceal how the
hushos fraudulently obtained phones from Vaknin.  See 3500-RC-6
(stating that Colon "heard of Hushos talking of using info to
obtain phones").

they sold.  See 3500-RC-6 (stating that Colon "heard of Hushos talking of using info to obtain phones").

Furthermore, Rabkin also claims that Vaknin admitted that he, and employees at his direction, bought stolen phones from the same street dealers to whom Vaknin and his employees had sold T-Mobile customer information.  Rabkin Aff. ¶¶ 17, 22. Vaknin never squarely denies this, but, nonetheless, insists that he "had no knowledge that [the] 'outside sources' [from which he purchased phones] had any connection with  . . . the handful of i.d.'s that [he] sold for cash."  Vaknin 2009 Supp. Decl. ¶ 12.  Vaknin's claim on this point is implausible.  Both St. Rose and Colon indicated that Vaknin was purchasing phones that were obtained with the information that he sold.  See supra.  Moreover, as discussed earlier, Vaknin has never disputed that he was buying stolen phones from the hushos at the same time that he was selling information to them – this fact alone is likely sufficient to establish Vaknin's knowledge of the Fraudulent Handset scheme.  Notably, Vaknin's attempt to segregate his sale of customer information to the hushos from his other contemporaneous dealings with them, based on his claim that he sold the information only for "cash," is absurd.

**Procedural History**

**a. Vaknin's Proffers and Guilty Plea**

Vaknin was represented by a number of different attorneys. Vaknin's first attorney only represented him at the arraignment and initial bail hearing. Second Supp. Decl. Mayer Vaknin in Supp. Habeas Corpus Pet. ("Second Supp. Vaknin Decl.") ¶ 2. The government eventually consented to Vaknin's release on bond based on Vaknin's representation that he wanted to cooperate. Affirmation of Assistant United States Attorney Jeffrey Rabkin ("Rabkin Aff.") ¶ 13. However, immediately upon his release, Vaknin fired his first lawyer and hired a different lawyer, Michael Rosen, who informed the government that Vaknin no longer wanted to cooperate. Id. The government soon learned from cooperating witnesses that the night that Vaknin was released on bond, he returned to his office and began shredding evidence of his criminal schemes. Id. After Vaknin was re-arrested for obstruction of justice, he again decided to cooperate with the government and had to get new counsel because Rosen had a policy of not representing cooperating witnesses. Second Supp. Vaknin Decl. ¶ 2.

Vaknin hired Harold Pokel in April 2006. Supp. Vaknin Decl. ¶ 2; CR-06-82-DGT, Docket Entry No. 43 (Apr. 24, 2006). Pokel advised Vaknin to cooperate and represented him during a

number of proffer sessions with Assistant United States Attorney Jeffrey Rabkin and the case agent.  Supp. Vaknin Decl. ¶¶ 11-15; Second Supp. Vaknin Decl. ¶ 2; Rabkin Aff. ¶¶ 13.

The government ultimately elected not to offer Vaknin a cooperation agreement because the evidence that Vaknin offered against Yonovitch, another target of the investigation, involved uncorroborated private conversations between the two men. Rabkin Aff. ¶ 18.  Rabkin and Pokel then began negotiating a plea agreement.  Id.

During the time that Vaknin was cooperating with the government and negotiating a plea agreement, some of Vaknin's employees were also cooperating with the government.  In some of Vaknin's later declarations in the instant § 2255 proceeding, he claims that he had "no idea what any of [his] employees who were cooperating were actually telling the government" and "simply assumed that some of the employees were lying to the government and saying [Vaknin] was somehow involved in order to garner more from the government for their cooperation" "because the government kept insisting that [Vaknin] was involved in the fraudulent handset conspiracy."  Supp. Vaknin Decl. ¶ 49; see also Second Supp. Vaknin Decl. ¶ 14.  However, according to Pokel, Vaknin informed Pokel that Rodriguez had told Vaknin "that it was Patrick [Rodriguez] and Kinda George who had done the handset fraud conspiracy and they had told the government

that they had done the scheme behind Vaknin's back." Decl. of
Harold Pokel ("Pokel Decl.") ¶ 6 (emphasis added). Indeed,
Vaknin admits that prior to pleading guilty, he was told by
Rodriguez, before a status conference, that Rodriguez, George
and others had been selling Cellular Island information. Vaknin
Post-Hearing Decl. ¶ 15; Decl. of John Mitchell ("First Mitchell
Decl.") ¶ 33; Def.'s PSR Objections Reply Mem. at 6. Moreover,
in Vaknin's first § 2255 affidavit, he stated that he "believed
that [his] employees had truthfully told the government that
[he] had nothing to do with illegally selling customer
information." First Vaknin Aff. ¶ 93.

According to Pokel, when he informed Rabkin about
Rodriguez's admission to Vaknin, Rabkin "specifically [told
Pokel] that [the government] had evidence [that Vaknin was
guilty of the Fraudulent Handset scheme] regardless of what
Patrick Rodriguez said and that Patrick's statements did not
make any difference." Pokel Decl. ¶ 7; see also Vaknin Post-
Hearing Decl. ¶ 15 ("[Pokel told me that Rabkin had stated that]
the 5-10 non-Cellular Island information which I sold . . . made
me responsible for the 741,000 dollars.").

When the government obtained the superseding indictment,
Vaknin was offered a new plea agreement, which is discussed in
detail below. Supp. Vaknin Decl. ¶¶ 16-17. In contrast to the
government's prior offer, the new plea offer required Vaknin to

plead guilty to three rather than two counts.  Id.  Vaknin
eventually dismissed Pokel because he was disappointed with
Pokel's efforts negotiating the plea agreement.  Second Supp.
Vaknin Decl. ¶ 3.  When the government learned that Pokel was no
longer representing Vaknin, the plea offer was withdrawn.  Supp.
Vaknin Decl. ¶ 25.

     Sometime in June 2006, Vaknin hired Harold Levy and
informed Levy that he wanted to plead guilty.  Supp. Vaknin
Decl. ¶ 23; Second Supp. Vaknin Decl. ¶ 2; Aff. of Harold Levy
("Levy Aff.") ¶¶ 5, 8, 12.  After Vaknin hired Levy, the
government revived the prior plea offer and gave Vaknin until
July 7, 2006 to accept the offer.  Levy Aff. ¶ 9.

     At Levy's recommendation, Vaknin agreed to the plea
agreement, which required that Vaknin plead guilty to conspiracy
to commit wire fraud (Count 1, related to the SPIF Fraud and
Commission Payment Fraud schemes) as well as to conspiracy to
commit to commit mail fraud and aggravated identity theft
(Counts 12 and 23, related to the Fraudulent Handset scheme).
Plea Agreement ¶ 1; Vaknin Supp. Decl. ¶ 32.

     The plea agreement did not include any sentencing
stipulation, but did calculate for the three counts an estimated
offense level of 36 and an estimated Guidelines range of 188 to

235 months.[17]  Under the estimated Guidelines range, Vaknin's
projected sentence was 212 to 259 months because the two-year
mandatory minimum sentence for the aggravated identity theft
charge in Count 23 had to run consecutive to the sentences on
the other two counts.

The estimated Guidelines ranges for Counts 1 and 12 each
included enhancements for:  (1) a loss exceeding $1,000,000;
(2) 250 or more victims; (3) receipt of stolen property;
(4) involvement of an unlawful access device; and (5) Vaknin's
leadership role.  Id.  The estimated Guidelines ranges also
included a 2-point enhancement for obstruction of justice as
well as a 2-point reduction for acceptance of responsibility.
Id.  Moreover, the government agreed to move for an additional
1-point reduction for acceptance of responsibility if Vaknin
pled guilty by July 7, 2006.  As part of the plea agreement,
Vaknin agreed not to appeal, or otherwise challenge, any
sentence of 286 months or below.  Id. ¶ 4.  Vaknin also agreed
that the following property was subject to forfeiture as a
result of his violations of Counts 1 and 12:  (1) his interest

---

[17]  The plea agreement explicitly stated that the Guidelines
estimate was not binding on the U.S. Attorney's Office, the
Probation Department or the Court.  Plea Agreement ¶ 3.
Although the plea agreement did not affirmatively state that the
Guidelines estimate was not binding on Vaknin, nothing in the
plea agreement indicates that it was.  See id. ¶ 2 ("The Office
estimates the likely adjusted offense level under the Guidelines
. . . . ") (emphasis added).

in a condominium in Miami; (2) the proceeds from the sale of Vaknin's business; and (3) his interest in a Hummer H2 automobile.  Id. ¶ 5; First Vaknin Aff. ¶¶ 73-75.  Pursuant to the plea agreement, the government agreed:  (1) to dismiss the remaining counts in the indictment; (2) not to bring any further related charges, including potential charges for tax fraud, unlawful employment of aliens and money laundering; (3) to take no position where Vaknin's sentence should fall within the Guidelines range determined by the court; and (4) not to seek a sentence above the high end of the estimated Guidelines range. Plea Agreement ¶¶ 2, 14.

On July 7, 2006, Vaknin pled guilty.[18]  Id. at 21.  At the plea hearing, Rabkin summarized the government's evidence, stating:

---

[18]  During the plea hearing, it was revealed that Levy, who had "only [been] retained two or three weeks" prior to the plea hearing, did not become aware of the superseding indictment until the day of the plea hearing.  Plea Hr'g Tr. at 22.  A break was taken during the hearing, and Levy went through the superseding indictment with Vaknin off the record.

There are a number of differences between the original and superseding indictments.  The superseding indictment included a seven page introductory section, which specifically discussed, for the first time, the SPIF Fraud scheme and the fact that, as part of the Fraudulent Handset scheme, defendants purchased the fraudulently obtained handsets from the unindicted co-conspirators and resold those handsets.  The superseding indictment also:  (1) added an obstruction of justice charge against Vaknin; (2) expanded the time period of the original indictment, which covered March 2004 to January 2006, to January

29

> Vaknin conspired with others to commit and
> did, in fact, commit [a criminal scheme
> involving] Vaknin's sale of T Mobile
> customer identity information . . . to
> coconspirators. These coconspirators used
> that identifying information fraudulently to
> obtain cellular phone handsets by calling
> T Mobile on behalf of mobile customers to
> place orders for the delivery of cellular
> phone handsets without the customer's
> knowledge and consent.
>
> Next, these coconspirators received
> delivery from commercial interstate carriers
> of the fraudulently obtained cellular
> telephone handsets, sold them back to Vaknin
> and others, who in turn sold them for a
> profit to customers at the Cellular Island
> stores . . . ."

Plea Hr'g Tr. at 38-39. Although Vaknin agreed with this

statement, when asked to describe in his own words what he did

in connection with the charges against him, Vaknin admitted to

engaging in the SPIF Fraud and Commission Payment Fraud schemes

and then stated, "I sold information without [customers']

knowledge," including a "minimal amount" of social security

numbers. Id. at 39.


**b. Sentencing**

Shortly after Vaknin pled guilty, he dismissed Levy as

counsel and hired John Mitchell on July 26, 2006. Supp. Vaknin

Decl. ¶ 35.

---

2004; and (3) specifically named George as a defendant in the
counts related to the Fraudulent Handset scheme.

The PSR issued in October 2006 differed from the estimated Guidelines contained in the plea agreement by not recommending any victim-related enhancement and not including any reduction for acceptance of responsibility.[19]  However, consistent with the estimated Guidelines in the plea agreement, the PSR recommended the enhancements for receipt of stolen handsets, trafficking of unauthorized access devices, leadership role and obstruction of justice.  The PSR also recommended for Counts 1 and 12 a total loss of more than $1,000,000.  Specifically, the PSR found that Vaknin was responsible for:  (1) $783,190 in intended losses for the SPIF Fraud scheme; (2) $200,840 in intended losses for the Commission Payment Fraud scheme; (3) $741,731 in intended losses for the Fraudulent Handset scheme; and (4) $418,268 in losses based on Vaknin's sales of fraudulently obtained handsets and equipment of wireless providers other than T-Mobile.  PSR ¶ 41.

---

[19]  In an addendum to the PSR that was issued after the parties submitted objections, the Probation Department ultimately adopted the government's position and recommended a six-point victim enhancement.  The addendum, however, continued to exclude any reduction for acceptance of responsibility.  Second Addendum to the PSR, dated Apr. 10, 2007.  The addendum reasoned that such reductions are ordinarily not appropriate where the defendant has obstructed justice and also stressed that Vaknin continued to deny that he obstructed justice.  Id. at 4.  It should be noted that when Vaknin objected to the PSR for failing to recommend a reduction for acceptance of responsibility, the government took no position on this point, indicating that "the plea agreement . . . reflected a three point reduction for acceptance of responsibility."

At some point, a _Fatico_ hearing was scheduled.  In
preparation, Mitchell subpoenaed and obtained documents from
T-Mobile and Ameritel and also filed objections to the PSR.
Mitchell Decl. ¶ 17; CR-06-82-DGT, Docket Entry No. 82 (Apr. 5,
2007 Letter from Mitchell to AUSA Daniel Silver).  In discussing
the background of the case, the PSR had disclosed that "George
sold [Cellular Island customer] information . . . independently
of Mayer Vaknin, as he was unaware of this conduct by George."
PSR ¶ 43.  Vaknin, however, did not receive the proffer notes
containing the witness statements underlying the PSR's assertion
until the government disclosed its 3500 material prior to the
scheduled _Fatico_ hearing.  First Mitchell Decl. ¶ 43.

Just prior to the scheduled _Fatico_ hearing, Vaknin, acting
on Mitchell's advice, elected to forgo the _Fatico_ hearing and
agreed to an 84-month sentencing stipulation.  Sept. 18, 2007
letter from Rabkin, Attachment ("Sentencing Stipulation"); Supp.
Vaknin Decl. ¶ 41.  In calculating the 84-month sentence, the
parties stipulated to a 2-point enhancement for obstruction of
justice, a 4-point enhancement for Vaknin's leadership role, a
14-point enhancement for a loss exceeding $400,000 and a 3-point
reduction for acceptance of responsibility, which resulted in a
Guidelines range of 51-63 months for Counts 1 and 12.  The
parties stipulated that, for those counts, a 60-month sentence
was reasonable.  In addition, the parties agreed that Vaknin

also had to serve an additional 24 months pursuant to his conviction on Count 23.  As part of the stipulation, Vaknin agreed not to make a downward departure motion or a motion for a non-Guidelines sentence.

At sentencing, Vaknin was given an 84-month sentence.  CR-06-82-DGT, Docket Entry No. 92 (July 10, 2007) (Judgment as to Mayer Vaknin).  In addition, the forfeiture set out in the plea agreement was found applicable and Vaknin was also ordered to pay $400,000 in restitution.  Id.

In the instant § 2255 proceeding, Vaknin claims that he is innocent of conspiring to commit the Fraudulent Handset scheme charged in Counts 12 and 23 and that, as such, his conviction and sentence should be vacated.

## Discussion

### (1)

### Brady Claim

Vaknin contends that the government violated Brady v. Maryland, 373 U.S. 83 (1959), by failing to disclose that cooperating witnesses had told the government that Vaknin was not aware of the sale of Cellular Island customer information by George, Rodriguez and Mourden.  However, Vaknin's Brady claim fails because: (1) Vaknin already knew that Rodriguez had told

33

the government that Vaknin was not involved in the sale of
Cellular Island customer information; and (2) even assuming
Vaknin did not have this knowledge, the allegedly suppressed
evidence was not material.

"Under Brady and its progeny, 'the Government has a
constitutional duty to disclose favorable evidence to the
accused where such evidence is 'material' either to guilt or to
punishment.'" United States v. Paulino, 445 F.3d 211, 224 (2d
Cir. 2006) (quoting United States v. Jackson, 345 F.3d 59, 70
(2d Cir. 2003)). "To establish a Brady violation, a defendant
must show (1) that the evidence at issue is 'favorable to [him],
either because it is exculpatory', or because it is impeaching;
(2) the 'evidence must have been suppressed by the State, either
willfully or inadvertently'; and (3) 'prejudice must have
ensued.'" Id. (quoting Strickler v. Greene, 527 U.S. 263, 281-
82 (1999)).

As the Supreme Court has explained,

> [the materiality analysis] is not a
> sufficiency of evidence test. A defendant
> need not demonstrate that after discounting
> the inculpatory evidence in light of the
> undisclosed evidence, there would not have
> been enough left to convict. The
> possibility of an acquittal on a criminal
> charge does not imply an insufficient
> evidentiary basis to convict. One does not
> show a Brady violation by demonstrating that
> some of the inculpatory evidence should have
> been excluded, but by showing that the
> favorable evidence could reasonably be taken

> to put the whole case in such a different
> light as to undermine confidence in the
> verdict.

Kyles v. Whitley, 514 U.S. 419, 434-35 (1995). "Materiality is assessed in light of the evidence adduced against the defendant at trial; when a conviction is supported by overwhelming evidence of guilt, habeas relief is not warranted." Leka v. Portuondo, 257 F.3d 89, 104 (2d Cir. 2001).

Where a defendant raises a Brady claim after pleading guilty, "evidence is considered material where 'there is a reasonable probability that but for the failure to produce such information the defendant would not have entered the plea but instead would have insisted on going to trial.'" United States v. Avellino, 136 F.3d 249, 256 (2d Cir. 1998) (quoting Tate v. Wood, 963 F.2d 20, 24 (2d Cir. 1992)). "Assessment of that question involves an objective inquiry that asks not what a particular defendant would do but rather what is 'the likely persuasiveness of the withheld information.'" Id.

In assessing a Brady claim, "[e]vidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982) (citations omitted). The government is not required to disclose evidence to a defendant "who is 'on notice of the essential facts which would enable him to call the

witness and thus take advantage of any exculpatory testimony that he might furnish.'" Id. (quoting United States v. Stewart, 513 F.2d 957, 600 (2d Cir. 1975)). "The rationale underlying Brady is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." Id. at 619.

Here, the alleged "Brady" material was not suppressed because Rodriguez's statements to Vaknin put him on sufficient notice. Vaknin was aware of the essential facts – Rodriguez had told him that Rodriguez and George had sold Cellular Island customer information and that Rodriguez "had told the government that they had done the scheme behind Vaknin's back." Pokel Decl. ¶ 6 (emphasis added). Indeed, Pokel raised this very issue in his meeting with the prosecutor. Thus, there is no Brady violation because the alleged "Brady" material simply would have confirmed what Vaknin already knew. Moreover, although other witnesses also informed the government that Vaknin was not involved in the sale of Cellular Island customer information, Vaknin already was aware of the existence of these witnesses (as they were his employees) and "believed that [they] had truthfully told the government that [he] had nothing to do

with illegally selling customer information."  First Vaknin Aff.
¶ 93.

Vaknin contends that "the value of [Rodriguez's] '<u>Brady</u>'
revelation was completely eviscerated when AUSA Rabkin told
[Vaknin's] lawyers that regardless of what Rodriguez said,
[Vaknin] was guilty of the hand set conspiracy."  Def.'s Apr.
12, 2009 letter at 4.  However, Rabkin never denied that
Rodriguez made the statements at issue to the government.
Rather, Rabkin merely stated that, based on other evidence, he
believed Vaknin to be guilty, regardless of Rodriguez's
statements.[20]  Pokel Decl. ¶ 7 (stating that Rabkin told Pokel
that the government "had evidence [that Vaknin was guilty of the
Fraudulent Handset scheme] regardless of what Patrick Rodriguez
said and that Patrick's statements did not make any
difference").  As such, Vaknin was still on notice of the
essential facts.

_____

[20]  Vaknin's argument might be stronger if Rabkin had told Pokel
that the other "evidence" that Rabkin was referring to included
statements by Rodriguez and other Cellular Island employees that
contradicted Rodriguez's representations to Vaknin.  Pokel's
declaration, however, does not indicate that Pokel ever asked
(or that Rabkin ever stated) what this "evidence" was.  In fact,
the "evidence" that Rabkin was alluding to was almost certainly
Vaknin's sale of T-Mobile customer information from the CD.
Notably, when Mitchell confronted Rabkin with Vaknin's claim
that he was not involved in selling Cellular Island customer
information, Rabkin insisted that Vaknin was still guilty of the
Fraudulent Handset scheme conspiracy based on the fact that
Vaknin "had admitted selling customer identities in his
debriefings with the government."  First Mitchell Decl. ¶ 21.

Furthermore, even assuming the alleged Brady material was suppressed, Vaknin still cannot show that this evidence was material.  As explained more fully in the context of Vaknin's ineffective-assistance claims, even if the government had provided him with the alleged Brady material and Vaknin's attorneys had not made any of the "errors" now alleged by Vaknin, there is not a reasonable probability that Vaknin would have insisted on going to trial.

## (2)

### Ineffective Assistance of Counsel Claims

To establish ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 697 (1984), a petitioner "must show that 'counsel's representation fell below an objective standard of reasonableness,' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  Forbes v. United States, 574 F.3d 101, 106 (2d Cir. 2009) (quoting Strickland, 466 U.S. at 688, 694).  Both prongs of the Strickland test need not be considered if a defendant fails to satisfy one of them.  Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

Similar to the materiality analysis under <u>Brady</u>, where a defendant claims that counsel was ineffective in recommending a guilty plea, "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985). In <u>Hill</u>, the Supreme Court explained that, in guilty plea cases,

> the 'prejudice' inquiry will closely
> resemble the inquiry engaged in by courts
> reviewing ineffective-assistance challenges
> to convictions obtained through a trial.
> For example, where the alleged error of
> counsel is a failure to investigate or
> discover potentially exculpatory evidence,
> the determination whether the error
> 'prejudiced' the defendant by causing him to
> plead guilty rather than go to trial will
> depend on the likelihood that discovery of
> the evidence would have led counsel to
> change his recommendation as to the plea.
> This assessment, in turn, will depend in
> large part on a prediction whether the
> evidence likely would have changed the
> outcome of a trial.

<u>Id.</u>[21]

In support of his ineffective assistance of counsel claim, Vaknin asserts that: (1) Levy and Pokel failed to investigate

---

[21] Although unlikely to affect the instant case, it should be noted that the Supreme Court recently granted certiorari in <u>Belleque v. Moore</u>, 130 S.Ct. 1882 (2010). One question the Supreme Court granted certiorari on is whether the defendant, who alleged that his attorney should have moved to suppress his confession, is required to show that he would have insisted on going to trial if counsel had done so. <u>Id.</u>

the facts and applicable law prior to Vaknin's guilty plea;
(2) because Levy and Pokel failed to do so, Mitchell should have
sought to vacate the plea; and (3) Levy improperly predicted
that Vaknin would receive a five-year sentence and failed to
inform Vaknin that he could not challenge the two-year mandatory
consecutive sentence for the aggravated identity theft
conviction.[22]

As an initial matter, however, it must be noted that the
numerous briefs submitted by Vaknin in this case presented
constantly shifting ineffective-assistance arguments. Vaknin's
initial briefs were only directed against Levy. Subsequently,
Vaknin expanded his arguments to include Pokel and Mitchell.
The first time that Vaknin even suggested that Pokel and
Mitchell were ineffective was at oral argument on January 16,
2009. Jan. 16, 2009 TR. at 15, 17, 21, 37, 43, 48. It was not
until Vaknin's post-hearing brief that Vaknin squarely argued
that Pokel was ineffective. Moreover, in that brief, Vaknin
only hinted at a claim that Mitchell was ineffective for failing
to seek to vacate the plea. See Corrected Post-Hearing
Submission, at 14 ("[G]iven Mitchell's advice in these

---

[22] A July 28, 2009 order suggested that Vaknin may have had an
argument that Mitchell was ineffective for advising Vaknin to
forgo the Fatico hearing and instead enter the sentencing
stipulation because, inter alia, Mitchell may have misunderstood
the sentencing implications of the plea agreement. Vaknin,
however, has never pursued this claim and it is therefore deemed
waived.

circumstances . . . counsel urges this Court to extend the
petition to Mr. Mitchell at this time in the interests of
justice and make that determination to require that Mr. Vaknin
be given his plea back on that basis as well.").

**a. Levy and Pokel's Failure to Investigate and
    Mitchell's Subsequent Failure to Seek Vacatur of the Plea**

**i.  Alleged Errors of Levy, Pokel and Mitchell**

Vaknin argues that Levy and Pokel were ineffective because
they should have recognized that Vaknin's sale of T-Mobile
customer information to the hushos was insufficient to establish
that he was guilty of the Fraudulent Handset Scheme charged in
Counts 12 and 23.  Specifically, Vaknin argues that rather than
accepting Rabkin's representations on this point, Pokel and Levy
should have investigated the facts and applicable law, which
ultimately should have led Levy to change his recommendation to
plead guilty.  Along similar lines, Vaknin also suggests that
Mitchell should have moved to vacate the plea based on Vaknin's
"innocence" and the alleged errors of Levy and Pokel.

Vaknin has not shown that Levy, the primary target of
Vaknin's ineffective-assistance claims, acted unreasonably.
Vaknin argues that Levy and Pokel should not have accepted
Rabkin's assertions that Vaknin's sale of customer information
established his guilt for Counts 12 and 23.  Rather, Vaknin
maintains that Pokel and Levy should have investigated the facts

underlying Vaknin's alleged guilt.  If Pokel or Levy had

subpoenaed T-Mobile, as Mitchell later did, they may have been

able to learn that:  (1) T-Mobile was not claiming that it had

evidence that any specific phones were fraudulently ordered

using the information Vaknin sold; and (2) only 127 of the

George & Rodriguez Phones were activated at Vaknin's stores

(collectively "the T-Mobile evidence").[23]  However, given the

time constraints that Levy was operating under (time constraints

that were created by Vaknin's decision to change counsel), it

appears unlikely that even the most diligent counsel would have

been able to obtain the T-Mobile evidence prior to Rabkin's plea

deadline.  As such, Vaknin's only potentially viable

ineffectiveness assistance claims on this issue would be

against:  (1) Pokel for failing to subpoena T-Mobile earlier; or

(2) Mitchell, who had the T-Mobile evidence, but did not seek to

vacate Vaknin's plea.

In any event, as explained in the analysis of prejudice and

materiality below, there is not a reasonable probability that,

absent the alleged errors of Vaknin's attorneys, Vaknin would

have proceeded to trial.

---

[23]  The relevant information was contained in a letter T-Mobile
submitted to the probation department seeking restitution.  The
letter, which Mitchell obtained through his subpoena, is dated
September 26, 2006, over two months after Vaknin pled guilty.
It should be noted that Vaknin never argued that the T-Mobile
evidence is "Brady" material.

ii.   **Prejudice/Materiality**

Even if the alleged Brady and Strickland violations had not occurred, there is not a reasonable probability that Vaknin would have insisted on going to trial.  Because Vaknin admitted to engaging in the SPIF Fraud and Commission Payment Fraud schemes, Vaknin would not have gone to trial on the counts related to those schemes.  Nonetheless, Vaknin's current counsel makes the rather implausible claim that he still would have gone to trial on the Fraudulent Handset scheme counts.  See Apr. 6, 2009 Tr. at 34 ("[H]e would absolutely have proceeded to trial on [the Fraudulent Handset scheme]; and with respect to the other charges, he may have decided to plead to those.  I mean, he may have had that decision.  I mean, they're out there; but he would have proceeded to trial on [the Fraudulent Handset scheme]").

No competent counsel, however, would have pursued this option.[24]  Vaknin would have gained no sentencing benefit from being found not guilty on the Fraudulent Handset scheme counts

---

[24]   Because Vaknin's Brady and Strickland claims focus on evidence that Vaknin did not have prior to the plea (due to either the government's alleged misconduct or the errors of Levy and Pokel), in addressing prejudice and materiality, it is appropriate to consider what actions competent counsel would have taken in light of this evidence.  Because Mitchell was aware of all of the evidence at issue, the analysis of the ineffective-assistance claim against Mitchell would appear to be the same under either prong of Strickland.

at trial.  Moreover, it was possible that he would have been
convicted at trial, which would have cost him the sentencing
reduction that he otherwise would have received for acceptance
of responsibility.

Even if Vaknin were found not guilty of the Fraudulent
Handset scheme counts at trial, all of Vaknin's conduct that
could have negatively impacted his sentence (including his sale
of customer information and purchases of stolen phones) would
still have been considered at sentencing as a factor under 18
U.S.C. § 3553.  See 18 U.S.C. § 3553(a)(1) ("the nature and
circumstances of the offense and the history and characteristics
of the defendant").  Moreover, all of those actions would
qualify as relevant conduct as to the SPIF and Commission
Payment Fraud schemes, for which Vaknin has conceded his guilt.[25]

When calculating a defendant's adjusted offense level, all
of the defendant's relevant conduct is considered, including
"acts and omissions . . . that were part of the same course of
conduct or common scheme or plan as the offense of conviction."

---

[25]  The government did not raise this exact argument.  It did,
however, raise a similar argument, contending that Vaknin could
not show prejudice because, based on the conduct that Vaknin
admitted to in his § 2255 papers, his Guidelines range would
still have been higher than the sentence he actually received.
Notably, as part of that argument, the government maintained
that Vaknin's buying and selling of stolen phones would qualify
as relevant conduct for purposes of applying the stolen property
enhancement.

U.S.S.G. § 1B1.3(a)(2); see also United States v. Martin, 157
F.3d 46, 49 (2d Cir. 1998).  "For two or more offenses to
constitute part of a common scheme or plan, they must be
substantially connected to each other by at least one common
factor, such as common victims, common accomplices, common
purpose, or similar modus operandi."  Martin, 157 F.3d at 50
(quoting USSG § 1B1.3 cmt. n.9(A)).  Relevant factors can also
include a common time period and a common type of merchandise.
Id.

     In the instant case, there was a common scheme or plan that
included: (1) Vaknin's sale of T-Mobile customer information;
(2) Vaknin's purchases and sales of stolen T-Mobile phones; and
(3) the SPIF and Commission Payment Fraud schemes.  First, in
all of these activities, T-Mobile was a common victim.  Second,
these activities involved common accomplices.  See PSR ¶¶ 11-15
(noting that Hampton, Colon and Pimentel were involved in the
SPIF Fraud and Commission Payment Fraud schemes as well as the
buying and selling of stolen phones); supra (discussing role of
Colon and Hampton in selling customer information from the CD to
the hushos).  Third, these activities occurred during the same
time period and are also all linked to the CD of T-Mobile
customer information that Vaknin purchased.  For the SPIF and
Commission Payment Fraud schemes, Vaknin used the customer
information on the CD, along with other sources of information,

to renew customers' service agreements and to add additional lines of service to customers' accounts. During the same time period, Vaknin was selling information from the CD to the hushos and buying stolen T-Mobile phones from them.[26]  In addition, the information sold by Vaknin from the CD was likely used by the hushos to acquire some of the T-Mobile phones that Vaknin was purchasing from them.  Fourth, Vaknin used his business as an instrumentality to conduct all of the above activities.

Although the majority of Vaknin's sales and purchases of stolen phones were T-Mobile phones, Vaknin also bought and sold stolen phones of other carriers, as indicated by the inventory control system and other evidence.  Vaknin's purchases and sales of these other stolen phones are also part of the same common scheme or plan described above because, _inter_ _alia_, all of these activities involved common accomplices, the use of Vaknin's business as an instrumentality and the same general time period. Moreover, on a very basic level, the SPIF and Commission Payment Fraud schemes and Vaknin's sales and purchases of T-Mobile and

---

[26]  The time period covered by the inventory control system, which tracked both stolen T-Mobile phones and other stolen phones, is not identified in the record.  Vaknin, however, was clearly buying and selling stolen T-mobile phones during the same time period that he was conducting the SPIF and Commission Payment Fraud schemes and selling information from the CD to the hushos.

non-T-Mobile phones all appear to have victimized large phone companies.

Thus, even assuming that Vaknin would have been found not guilty of the Fraudulent Handset scheme counts, all of Vaknin's conduct described above would still have been considered as relevant conduct at sentencing. Moreover, Vaknin's guilty plea as to Counts 12 and 23 would not have prevented him from attempting to argue at sentencing that he should not be held responsible for all of the victims and losses caused by the George & Rodriguez Phones because he only purchased some of the George & Rodriguez Phones and, arguably, did not profit (or receive any benefit) from much of the Cellular Island customer information that was sold to the hushos.

In addition, even if Vaknin were found not guilty of Count 23 (the identity theft count stemming from the Fraudulent Handset scheme), he still would have received a two-year mandatory minimum consecutive sentence for committing at least one of the identity theft violations related to the SPIF Fraud and Commission Payment Fraud schemes (Counts 13-22).[27] In the

---

[27] The government incorrectly claims that each of the eleven identity theft counts Vaknin was charged with "carries a two year mandatory minimum sentence of imprisonment that must run consecutive to one another and to any other charges." Rabkin Aff. ¶ 21 (emphasis added); see also July 22, 2010 letter from Assistant U.S. Attorney Rachel J. Nash, at 6 ("[Vaknin] would face eleven counts of identity theft, carrying a total mandatory period of imprisonment of twenty-two years."). However, the

instant proceeding, Vaknin has never gone so far as to argue

that he is innocent of any of these counts.  Although Vaknin's

objections to the PSR argued that he did not engage in the SPIF

Fraud scheme as often as the government claimed, in those

objections Vaknin conceded engaging in the SPIF Fraud scheme in

July and August 2005.  Def.'s Objections to PSR at 17.  As such,

by Vaknin's own admission, he appears to be guilty of Counts 16,

17 and 18, which charged him with unlawfully using identity

information on two dates in July 2005 and one date in August

2005.  Moreover, Vaknin has never claimed that he did not

unlawfully use identity information to conduct the Commission

Payment Fraud scheme on the dates listed in Counts 13-22.

Not only was there no potential benefit in going to trial

on the Fraudulent Handset scheme counts, there would have been

significant negative sentencing consequences for Vaknin if he

were convicted of the Fraudulent Handset scheme counts at trial.

If convicted at trial, Vaknin would have forfeited the three

points for acceptance of responsibility that he would have

otherwise received.  Moreover, a conviction after a trial may

well have resulted in the Court's unwillingness to exercise its

---

government misreads the identity theft statute.  Although the
two-year mandatory minimum sentence for an identity theft
conviction must run consecutively to sentences for other
offenses, the mandatory minimums for multiple identity theft
convictions can run concurrently to each other.  18 U.S.C.
§ 1028A(b)(4).

sentencing discretion in Vaknin's favor, particularly if the Court believed Vaknin had testified falsely or presented a false defense.  Furthermore, going to trial may have also made it less likely that the government would have been willing to enter into a sentencing stipulation.

It is unnecessary to determine whether Vaknin was, in fact, guilty of the Fraudulent Handset scheme counts, because there was, at the very least, a possibility that he would have been convicted of these counts at trial.  This would have been enough to deter any competent counsel from proceeding to trial.[28]

Vaknin claims that he is innocent because the Fraudulent Handset scheme is limited, both factually and in the indictment, to the sale of Cellular Island information and the phones obtained with that information.

Vaknin maintains that his sales of customer information to the hushos and purchases of phones from them, which had not been obtained with Cellular Island customer information, are

---

[28]  Vaknin has not shown that he was prejudiced by any provisions of the plea agreement.  Most importantly, the plea agreement did not contain any sentencing stipulation; the agreement's estimated Guidelines range was not binding on Vaknin.  As to the appeal waiver and forfeiture provisions, it should be noted that if Vaknin had simply pled guilty, without a plea agreement, to all 25 counts of the indictment, he would have avoided the appeal waiver and could have contested the amount of forfeiture while still retaining the benefit of the acceptance of responsibility reduction.  Vaknin, however, has never contended that he would have pursued this option.  In addition, the plea agreement also contained provisions favorable to Vaknin.

irrelevant because the conspiracy charged in Counts 12 and 23 was limited to Cellular Island customer information.  The indictment, however, refers to the identity information of "T-Mobile customers," which could include, but is not necessarily limited to, Cellular Island customers.  Moreover, the government never represented that the Fraudulent Handset scheme charged in the indictment was limited to phones acquired with Cellular Island customer information.  Rabkin Aff. ¶ 17; see also id. ¶ 28; Plea Hr'g Tr. at 38 (referring, in summary of evidence against Vaknin, to "sale of T Mobile customer identity information").

Vaknin also suggests that even if the indictment were not limited to Cellular Island customer information, the government's evidence did not establish his guilt for Counts 12 and 23.  As an initial matter, Vaknin claims that he was not aware that the phones he purchased from the hushos had been acquired through the Fraudulent Handset scheme using T-Mobile customer information.  Vaknin also contends that, factually, the Fraudulent Handset scheme was limited to the George & Rodriguez Phones because the only source of T-Mobile customer information that T-Mobile and the government explicitly linked to specific fraudulently obtained phones was the Cellular Island customer information sold by George, Rodriguez and Mourden.  In addition, Vaknin contends that the information he sold to the hushos was

not part of the Fraudulent Handset scheme because he sold that information purely for cash and there is no evidence that the customer information he sold was used to fraudulently obtain any specific phones. Moreover, Vaknin points out that only 127 of the George & Rodriguez Phones were activated at his stores and maintains that this is insufficient to establish his guilt for Counts 12 and 23.

Vaknin's arguments, however, simply ignore much of the evidence against him. Despite his denials, there is evidence that Vaknin, who was selling information to the hushos at the same time that he was purchasing phones from them, knew that the hushos were using T-Mobile customer information to fraudulently obtain phones. Moreover, although T-Mobile did not provide evidence showing that specific phones were fraudulently ordered with the information that Vaknin sold from the CD, there is other evidence that the hushos used that information to obtain phones through the Fraudulent Handset scheme and that Vaknin, knowing this, purchased at least some of the phones obtained with that information. Thus, contrary to Vaknin's argument, the Fraudulent Handset scheme was not limited, factually, to the George & Rodriguez Phones. In addition, Vaknin ignores evidence that: (1) he purchased, either personally or through employees acting at his direction, 127 of the George & Rodriguez Phones (and likely much more); (2) even if Vaknin was not aware of the

specific source of the T-Mobile information that was used to

fraudulently obtain the George & Rodriguez Phones, he still knew

that those phones had been fraudulently obtained with T-Mobile

customer information; (3) starting in 2004 and continuing

throughout 2005, Vaknin orchestrated repeat purchases of large

quantities of phones from the hushos; (4) the inventory control

system showed that $658,192 worth of "fraudulently obtained"

T-Mobile equipment and 418,268 worth of "fraudulently obtained"

equipment from other carriers were purchased and sold at

Vaknin's direction;[29] and (5) the Fraudulent Handset scheme was

likely the source of a significant amount of the T-Mobile

equipment referenced in the inventory control system.  Based on

these facts, it is not surprising that Rabkin insisted that

Vaknin was guilty of the Fraudulent Handset scheme counts.

---

[29] Vaknin erroneously contends that the only loss related to
Counts 12 and 23 was the $741,731 loss stemming from the 1,940
George & Rodriguez Phones and that this shows that, factually,
the Fraudulent Handset scheme was limited to phones obtained
with Cellular Island information.  Although the PSR did not
explicitly include the $658,192 worth of T-Mobile phones from
the inventory control system in Vaknin's loss calculation, the
PSR apparently only failed to do so because Probation
incorrectly assumed that this loss was already part of the
$741,731 loss stemming from the George & Rodriguez Phones.  PSR
¶¶ 16-17, 30.  However, the $741,731 loss and $658,192 loss are,
to some degree, distinct because: (1) Vaknin likely did not
purchase all of the George & Rodriguez Phones; and (2) the
inventory control system, which tracked all stolen T-Mobile
purchased by Vaknin, was not limited to the George & Rodriguez
Phones.  The fact that Probation's loss calculation included the
$418,268 loss from the inventory control system related to non-
T-Mobile phones shows that Probation did not intend to exclude
the $658,192 loss.  PSR ¶ 32.

52

Moreover, in deciding whether to go to trial on the Fraudulent Handset scheme counts, competent counsel would not have ignored the potential impact of Vaknin's guilty plea on the counts related to the SPIF Fraud and Commission Payment Fraud schemes and the damning admissions of Vaknin and statements of his employees regarding Vaknin's role in orchestrating those schemes. For Vaknin to have had any chance of being found innocent of the Fraudulent Handset scheme counts, a jury would had to have concluded that Vaknin's version of events (i.e., his claim that he did not know that the hushos were fraudulently obtaining phones using T-Mobile information) was credible enough to create a reasonable doubt even though his version of events is difficult, if not impossible, to reconcile with other evidence in the case. In light of that evidence, the overwhelming evidence of his guilt of the SPIF Fraud and Commission Payment Fraud schemes and the high-level role that he played in those two schemes, a jury would have been unlikely to credit Vaknin's version of events and his multiple attempts to minimize his own conduct.

Thus, even absent the alleged <u>Brady</u> and <u>Strickland</u> violations, there is not a reasonable probability that Vaknin would have proceeded to trial on the Fraudulent Handset scheme

counts, let alone on all the counts.[30]  For the same reasons,

Mitchell was not ineffective for failing to seek to vacate

Vaknin's guilty plea.  As such, Vaknin's ineffective-assistance

and Brady claims on these issues are denied.


**b. Additional Ineffective-Assistance Claims against Levy**

Vaknin raises additional ineffective-assistance of counsel

claims against Levy regarding the sentencing implications of the

plea agreement.  However, irrespective of any potential errors

by Levy, Vaknin cannot show prejudice because, as explained in

the previous section, there is not a reasonable probability that

he would have rejected the plea agreement and proceeded to

trial.  Moreover, as discussed below, Vaknin's ineffective-

---

[30]  In the real world, if Vaknin truly believed that he was
innocent of the Fraudulent Handset scheme counts, rather than
going to trial, he would have attempted to simply negotiate a
different plea agreement in which he only admitted his guilt on
the counts related to the SPIF Fraud and Commission Payment
schemes.  A new plea agreement likely could have been worked out
as it is doubtful that Rabkin would have insisted on going to
trial on just the Fraudulent Handset scheme counts.  Even if the
parties were unable to come up with an amended plea agreement on
their own, the Court would not have allowed the case to proceed
to trial on just the Fraudulent Handset scheme counts,
particularly if Vaknin informed the Court that he was willing to
plead guilty to the counts related to the other two schemes.
The Court would have stressed to the parties that it would be
absurd to go to trial on the Fraudulent Handset scheme counts
because even if Vaknin were convicted, those convictions would
ultimately have had little or no impact on sentencing in light
of Vaknin's plea as to the SPIF Fraud and Commission Payment
Fraud schemes.

assistance claims regarding Levy's sentencing advice and prediction also fail for other reasons.

Vaknin argues that Levy failed to inform him that he could not challenge the two-year mandatory consecutive sentence for the aggravated identity theft conviction (Count 23). Second Supp. Vaknin Decl. ¶ 7. Levy does not address this allegation, which Vaknin raised for the first time after Levy filed his affidavit. Def.'s Reply Mem. at 19. However, at the plea hearing, Levy represented, on the record, that he had informed Vaknin that "he must do the two years, at the very least, aggravated identity theft count." Plea Hr'g Tr. at 41. Notably, Vaknin, who spoke out at the plea hearing to correct at least one factual misstatement by Levy, never contested this representation at the plea hearing. Id.

Vaknin also claims Levy predicted that, notwithstanding the estimated Guidelines range set out in the plea agreement, the Court would impose a sentence of five years or less because this was a white collar fraud case. Supp. Vaknin Decl. ¶ 33; see also Vaknin Supp. Mem. at 5 (claiming that Levy told Vaknin that it was his "considered opinion that Judge Trager would impose a sentence of less than five years" and that he was "quite confident that his prediction . . . would be accurate."); id. at 25. ("Mr. Levy did not literally 'promise' [the five-year sentence] to [Vaknin], but rather it was presented as a

prediction by an experienced attorney . . . ."). Vaknin asserts
that Levy should have told him that he would likely receive a
Guidelines sentence and further notes that Levy's prediction
ignored the government's ability to appeal a sentence favorable
to Vaknin. It should, however, be noted that Vaknin does not
argue that Levy failed to explain the maximum sentence that
Vaknin faced under the plea agreement.

Levy does not deny making this "five year" prediction and
admits telling Vaknin that "in [his] experience, Judge Trager
frequently imposes a sentence lower than the government
proposes." Levy Aff. ¶ 15. Levy, however, also maintains that
he added some caveats, which Vaknin never specifically refutes.
Levy asserts that he told Vaknin that he "could not guarantee
any particular sentence and that we might not prevail with our
arguments regarding the loss amount and Guidelines
calculations." Id. Levy also maintains that he emphasized that
this Court does not "always" impose a lower sentence than
requested by the government and that Levy "could not guarantee
what Judge Trager would do in this instance as the court would
make an independent decision regarding the appropriate sentence.
Levy Aff. ¶ 15.

Because Levy merely made a prediction, which explicitly
included a number of caveats about the sentence Vaknin would
receive, Vaknin's claim fails. Cf. United States v. Sweeney,

878 F.2d 68, 70 (2d Cir. 1989) ("The law in this circuit prior

to the Sentencing Guidelines was clear that a defendant was not

entitled to withdraw a guilty plea simply because his attorney

erroneously predicted his sentence.").  Moreover, Vaknin has not

shown that Levy's prediction was incorrect.  Vaknin elected to

enter into a sentencing stipulation that barred him from seeking

a lower non-Guidelines sentence.  It is therefore unclear what

sentence he would have received if he had not entered the

sentencing stipulation and instead proceeded to a sentencing

hearing where the Court would have exercised its full

discretion.  Furthermore, although Vaknin argues that Levy's

prediction ignored the government's ability to appeal a sentence

favorable to Vaknin, it is unlikely that the government would

have appealed the five-year sentence Levy thought probable.

Finally, Vaknin claims Levy told him that by pleading

guilty, Vaknin was not conceding anything as he could

subsequently challenge "everything" at a Fatico hearing, which

Vaknin "understood was like a mini-trial after the plea but

before sentencing."  Second Supp. Vaknin Decl. ¶ 6.  However, in

a June 30, 2006 letter that Levy sent to Vaknin, Levy clearly

explained what Vaknin could challenge at sentencing, stating:

> the Guidelines explanation in the Plea
> Agreement simply reflect the Government's
> position, and by signing the Agreement we
> are not acknowledging in any way that these
> are in fact the actual Guideline figures.

> We are still at liberty to challenge any
> adjustments that we think are inappropriate
> or excessive.  The only thing you are
> consenting to is the forfeiture of the
> listed assets.

June 30, 2006 Letter from Levy to Vaknin; see also Levy Aff.
¶ 16.  As such, Vaknin's additional ineffective assistance of
counsel claims against Levy regarding the sentencing
implications of the plea agreement fail.


### (3)

### Other Claims

In his initial § 2255 brief, Vaknin raised two additional
claims.

First, Vaknin argued that his guilty plea was not knowing
and voluntary because, inter alia: (1) Vaknin was threatened by
fellow inmates; (2) the government threatened to prosecute his
mother and fiancée if he did not plead guilty; (3) the
government abused the cooperation process by telling Vaknin that
accepting the plea offer would demonstrate his "good faith"
about cooperation; and (4) the government told Vaknin that it
would not give him a cooperation agreement if he applied for
bail.  Despite claiming that these factors rendered his guilty
plea not knowing and voluntary, Vaknin's initial brief did not
seek to have the plea withdrawn on this basis.  Rather, Vaknin

only argued that he should be re-sentenced and that those factors should be taken into consideration at re-sentencing.

Second, Vaknin argued that the government prevented him from informing the Court at sentencing that the government had withdrawn the cooperation agreement because Vaknin applied for bail.

Both of these claims are procedurally barred. The "general rule [is] that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice." Massaro v. United States, 538 U.S. 500, 504 (2003). Vaknin did not appeal. Moreover, Vaknin, who does not allege that his counsel was ineffective in failing to raise these claims earlier, has not shown cause.

Moreover, the waiver provision in Vaknin's plea agreement clearly bars the second claim, and most likely the first claim as well. See Parisi v. United States, 529 F.3d 134, 138 (2d Cir. 2008) ("To raise a claim despite a guilty plea or appeal waiver, the petitioner must show that the plea agreement was not knowing and voluntary . . . because the advice he received from counsel was not within acceptable standards." (citation and internal quotation marks omitted)), cert. denied, 129 S. Ct. 1376 (2009). As such, these claims fail.

## Conclusion

For the reasons outlined above, Vaknin's petition is denied. The Clerk of the Court is directed to close the case.

Dated: Brooklyn, New York
      August 23, 2010

SO ORDERED:

_____/s/_____
David G. Trager
United States District Judge